UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBORAH BRADSHAW and CHRYSTAL ANTAO, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | )  Case No. 22-CV-0306-CVE-CDL ) |
| AMERICAN AIRLINES, INC. and MESA AIRLINES, INC., | ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court are defendants Mesa Airlines, Inc.'s ("Mesa") and American Airlines, Inc.'s ("American") motions for summary judgment (Dkt. ## 40, 42), plaintiffs' responses (Dkt. ## 55, 57), and defendants' replies (Dkt. ## 62, 63). This is a negligence action arising out of an in-flight aircraft emergency, which allegedly injured plaintiffs. Dkt. # 2-7. On June 29, 2022, plaintiffs Deborah Bradshaw and Chrystal Antao filed a second amended petition (Dkt. # 2-7) in the District Court of Tulsa County, Oklahoma against defendants Mesa and American alleging one count of "negligence/negligent infliction of emotional distress." Id. at 3-5. Plaintiffs seek actual and punitive damages based on defendants' alleged negligence. Id. at 5. On July 14, 2022, defendants removed this case to federal court because "there is complete diversity between [p]laintiffs and [d]efendants, and the amount in controversy exceeds the sum or value of $75,000." Dkt. # 2, at 2. Defendants now move, pursuant to Fed. R. Civ. P. 56, for summary judgment on plaintiffs' negligence claim. Dkt. ## 40, 42. Defendants argue that they acted properly and did not breach their respective duties in the handling of the in-flight emergency, and there are no facts to support that their actions or omissions caused plaintiffs' alleged injuries. Dkt. ## 40, 42. Plaintiffs respond that Mesa was

negligent by failing to timely communicate to passengers the status of the emergency and by "not descend[ing] to the highest safest altitude," Dkt. # 55 at 34, and American was negligent because it did not proactively provide "medical personnel at the airport after having been informed of the in-flight emergency." Dkt. #57 at 7.

### I.

The following facts are taken from defendants' motions[1] and the record: Mesa provides regional airline services for American, pursuant to a written agreement between the parties.[2] Dkt. # 42, at 2. Their agreement "provides that Mesa shall provide all crews (flight and cabin) and maintenance personnel necessary to operate all flights." Id. Mesa "provides its own aircrafts for operation and causes said aircrafts to be inspected, serviced, repaired, overhauled and tested in accordance with the [a]greement and Mesa's FAA approved maintenance program." Id.

On June 7, 2020, Mesa operated one such flight. Dkt. # 42, at 2; Dkt. # 40, at 9. Plaintiffs were passengers on the flight. Dkt. # 42, at 2; Dkt. # 40, at 9. During the flight, the aircraft's anti-ice and leak controller malfunctioned," which "provided the pilot with a left bleed duct warning." Dkt. # 40, at 9. When the anti-ice and leak controller failed, "the bleed valves closed automatically." Id. at 13. Closing the bleed valves is "a design feature to protect damaging the aircraft," and was out

---

[1] Plaintiffs "contest" a number of defendants' material facts, but their response briefs fail to cite to any evidentiary material in the record to dispute defendants' facts, as required by Fed. R. Civ. P. 56 and LCvR56. Therefore, the Court considers defendants' facts to be "undisputed," Fed. R. Civ. P. 56(e)(2), and "deemed admitted for the purpose of summary judgment." LCvR 56(c)(e).

[2] In addition to providing regional air services, the agreement also contains an indemnity provision, which "requires Mesa to indemnify American for claims brought against it based on alleged tortious acts of Mesa." Dkt. # 42 at 2-3. Pursuant to that indemnity provision in the agreement, American tendered this matter to Mesa, and Mesa accepted the tender. Id. at 3.

of the flight crew's control.  Id.  The closure of the valves caused a loss of cabin pressure, which "automatically deployed" the aircraft's oxygen masks and "required an emergency descent."  Id. at 10.  Simply put, the "failure of the anti-ice and leak controller caused loss of cabin pressure," which "required an emergency descent."  Id. at 10.  "Mesa's Emergency Procedures Checklist ("EPC") and Quick Reference Handbook ("QRH") provide the procedures to be applied during a failure of the left or right bleed duct indicated by a red warning light," which includes the procedures for a rapid descent.[3]  Id.; Dkt. # 40-5, at 8.  Both sets of procedures are "approved by the Federal Aviation Act and the aircraft's manufacturer."  Dkt. # 40, at 10.

Captain Omar Aquino was the pilot of the flight.  Id. at 8.  During the emergency, Captain Aquino's "immediate priority was to ensure a safe flight path and to preserve the condition of the aircraft."  Id.  The captain "followed the processes provided for in the EPC and QRH" for the descent, and the flight crew "executed the appropriate Emergency Descent Procedure."  Id.  "During the entire descent, Captain Aquino and the [f]irst [o]fficer worked through the necessary processes to appropriately and safely operate and prepare the aircraft for landing."  Id.  The first officer "located and communicated all necessary checklists" throughout the incident.  Id.  All of this occurred while the captain "continued to fly the aircraft through a controlled emergency descent,

---

[3]  Defendants' expert witness, Captain Edward Davidson, reviewed the materials and his report supports that the EPC and QRH provide the correct procedures for the situation.  Dkt. # 40-5, at 8, 20.  Plaintiffs assert that the expert improperly relied on "materials and procedures that were not in place at the time" of the flight.  Dkt. # 55, at 7.  This seems to be based on the fact that the replications of Mesa's procedures found in the expert witness's report are dated November 15, 2020, which was approximately five months after the flight.  However, Captain Edward Davidson stated that he "reviewed the EPC and QRH which were in effect at the time of [the flight] on June 7, 2020 and can confirm that the relevant provisions therein, and those identified within [his] report, are the same."  Dkt. # 62-1.  Therefore, plaintiffs' concerns about the applicability of the materials are unwarranted.

determined the flight path and locale for landing, and communicated the emergency to air traffic control."[4] Id. When the aircraft reached 10,000 feet and "Captain Aquino was able to ensure the descent was under complete control," he "announced to the passengers that the aircraft lost cabin pressure, was operating safely, and was being diverted to land in Atlanta." Id. at 11. The aircraft subsequently landed in Atlanta, at which point the "aircraft mechanic confirmed the failure of the bleed system, which explains why the aircraft lost pressurization." Id. at 11, 14.

At the time of the flight, Captain Aquino "had over 4,000 flight hours and 1,776 landings as a Captain," and he has flown the style of aircraft that was used on that flight since 2008. Id. at 14. He "was trained, and has continually been taught, to prioritize the immediate actions in the following order: (1) aviate, (2) navigate, and (3) communicate." Id. The "immediate priority is to ensure the safe operation of the aircraft. He then focuses on the navigation of the aircraft," which, in this case required "an emergency descent, and diversion to Atlanta." Id. "Finally, he communicated the emergency situation to the air traffic controller, and then when the emergency was under control, he communicated the situation to the [f]light passengers." Id.

---

[4] Plaintiffs argue that the pilot "did not have the aircraft under control during the cabin decompression and rapid loss of altitude." Dkt. # 55, at 8. However, this is not supported by the record. Plaintiffs cite to Captain Aquino's affidavit, in which he states, "[o]nce we reached 10,000 feet, and were able to ensure the emergency descent was under complete control, I was able to provide the passengers with an announcement over the PA." Dkt. # 55, at 33. This statement does not support plaintiffs' claim that Captain Aquino lacked control over the aircraft during the descent. Instead, it explains that he was able to communicate with the passengers once they reached the safe altitude of 10,000 feet because that was when he was "able to ensure the emergency descent was under complete control." Id. Ensuring at that point that the *situation* was under control does not raise a negative inference that the pilot did not have control of the *aircraft* during the descent. Instead, the only scenario supported by the record is that the captain was in control of the aircraft during its emergency descent, and once he successfully brought the aircraft to 10,000, then the emergency situation was under control and he was able to communicate the situation to the passengers.

Bradshaw claims that she was injured during the flight, and "now has high blood pressure, asthma, and panic attacks." Id. at 11. Antao also claims that she was injured during the flight, and "now suffers/suffered from muscle soreness, joint paint, 'decompression sickness,' panic attacks, anxiety/depression, and tinnitus." Id.

Plaintiffs neither notified defendants of their alleged injuries, nor requested medical attention, while on the flight or while still in the airport after the flight. Dkt. # 63-1, at 4: Dkt. # 63-2, at 4; Dkt. # 63-3, at 2; Dkt # 63-4, at 2. Further, plaintiffs stated that they have no training in plane mechanics nor as pilots, do not know exactly what happened on the flight, and are aware that flights can experience in-air emergencies, through no fault of the defendants. Dkt. # 40, at 13.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery[,]" Fed. R. Civ. P. 56(b), including before any discovery has been conducted. "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Silverstein v. Federal Bureau of Prisons, 559 F. App'x 739, 752 (10th Cir. 2014); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Plaintiffs' petition contains one claim for relief based on negligence,[5] but that claim also discusses negligence per se. Dkt. # 2-7, at 3-4. Under Oklahoma law, the essential elements of a negligence claim are "(1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure to properly perform that duty, and (3) the plaintiff's injury being proximately caused by the defendant's breach." Thompson v. TCI Products Co., 81 F. Supp. 3d 1257, 1266 (N.D. Okla. 2015).

---

[5] Plaintiffs label their single claim for relief as "Negligence/Negligent Infliction of Emotional Distress." Dkt. # 2-7, at 3. The Oklahoma Supreme Court has been clear that negligent infliction of emotional distress is not an independent tort, but a plaintiff may recover damages for emotional or mental distress as part of an ordinary negligence claim. Ridings v. Maze, 414 P.3d 835, 837 (Okla. 2018); Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc., 916 P.2d 241, 243 n.1 (Okla. 1996). In order to recover for negligent infliction of emotional distress "[t]he plaintiff must be a victim, not a bystander, directly involved in the incident, damaged from directly viewing the incident[,] and a close family relationship must exist between the plaintiff and the party whose injury gave rise to plaintiff's mental anguish." Ridings v. Maze, 414 P.3d 835, 838 (Okla. 2018) (quoting Shull v. Reid, 258 P.3d 521 (Okla. 2011)). Therefore, plaintiffs must to prove "1) the plaintiff[s] w[ere] directly physically involved in the incident; 2) the plaintiff[s] w[ere] damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff[s] and the part[ies] whose injur[ies] gave rise to the plaintiff[s'] mental anguish." Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc., 916 P.2d 241, 248 (Okla. 1996). Plaintiffs do not allege any familial or other close personal relationship existed between them, or between either of them and any other person injured on the flight. Therefore, plaintiffs cannot recover for negligent infliction of emotional distress.

Oklahoma also courts recognize the doctrine of negligence per se, and in some cases a statutory duty may also function as a parallel common law duty for a negligence claim. Howard v. Zimmer, Inc., 299 P.3d 463, 467 (Okla. 2013). To establish that a statute can be substituted for the standard of care, the plaintiff "must demonstrate the claimed injury was caused by the violation, and was of the type intended to be prevented by the statute. Finally, the injured party must be one of the class intended to be protected by the statute." Id. While it is unclear from plaintiffs' petition and briefing if their claim is based on negligence or negligence per se, the result in this case is the same. As discussed below, the federal regulations provide the applicable standards of care, so any violations of those regulations may constitute a breach of the applicable duty under either negligence or negligence per se.

Pursuant to the Supremacy Clause of the United States Constitution, Congress has the power to enact statutes that preempt state law. Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas, 489 U.S. 493, 509 (1989). There are three types of federal preemption: 1) "express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law"; 2) field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it"; and 3) conflict preemption, which occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998). The Tenth Circuit conducted a field preemption analysis and determined that in enacting the Federal Aviation Act (FAA), 49 U.S.C. § 40101 et seq., "Congress intended federal law to regulate exclusively" the field of aviation safety. US Airways,

Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010). "Based on the FAA's purpose to centralize aviation safety regulation and the comprehensive regulatory scheme promulgated pursuant to the FAA, . . . federal regulation occupies the field of aviation safety to the exclusion of state regulations." Id. at 1326; see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

The O'Donnell court was clear, however, that while federal law governed the substantive regulation of aviation safety, this preemption did not impact the availability of state tort remedies in connection with violations of those federal regulations. The court explained that the FAA's savings clause "leaves in place remedies then existing at common law or by statute." Id. (quoting Cleveland By & Through Cleveland v. Piper Aircraft Corp., 985 F.2d 1438, 1442-43 (10th Cir. 1993), abrogated on other grounds by, US Airways, Inc. v. O'Donnell, 627 F.3d 1318 (10th Cir. 2010)). The court explained that this preemption does not impact the availability of "state tort remedies," but does apply when state law "impos[es] substantive requirements." O'Donnell, 627 F.3d at 1326. In this case, the substantive requirements are the standards of aviation safety that defendants must satisfy. Therefore, federal aviation regulations dictate the applicable standards of care for safely operating aircraft, and state law negligence claims could provide a remedy for breaches of the federally imposed standards of care. See Cleveland, 985 F.2d at 1441 ("Congress may reserve for the federal government the exclusive right to regulate safety in a given field, yet permit the states to maintain tort remedies covering much the same territory."), abrogated on other grounds by, US Airways, Inc. v. O'Donnell, 627 F.3d 1318 (10th Cir. 2010); Abdullah v. American Airlines, Inc., 181 F.3d 363, 375 (3d Cir. 1999) ("Even though we have found federal preemption of the standards of aviation safety, we still conclude that the traditional state and territorial law

remedies continue to exist for violation of those standards. Federal preemption of the standards of care can coexist with state and territorial tort remedies."); Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255-56 (1984) (finding that state tort remedies could coexist with the federal nuclear safety regulations that preempted state standards of care).

Federal aviation regulations address "virtually all areas of air safety." O'Donnell, 627 F.3d at 1327 (quoting Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 224 (2d Cir.2008)); see, e.g., 14 C.F.R. § 121.575 (addressing airlines' alcoholic beverage services); 14 C.F.R. § 121.571 (specifying the mandatory briefings that must be provided to all passengers on aircraft); 14 C.F.R. pt. 121, app. A (identifying the minimum number of first-aid kits that must be stored on aircraft and the items that each first-aid kit must contain). Federal aviation regulations also identify the general standard of care for operating an aircraft: "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13. This careless or reckless standard applies to all of defendants' alleged breaches.[6] If, construing the facts and the record in the light most favorable to plaintiffs, there is more than a scintilla of evidence that defendants' actions or conduct were reckless or careless, then summary judgment must be denied.

The Court finds that there is no evidence in the record that suggests defendants violated any relevant aviation safety regulation. Plaintiffs assert that Mesa was negligent because "the pilot failed to advise passengers of an immediate, considerable threat to passengers," Dkt. # 55, at 24, and "the pilot did not descend to the highest safest altitude, rather he descended to the lowest altitude

---

[6] Plaintiffs' brief also cites 14 C.F.R. § 91.403(a), which provides that "[t]he owner or operator of an aircraft is primarily responsible for maintaining that aircraft in an airworthy condition." However, plaintiffs do not argue that defendants failed maintain the aircraft in accordance with this regulation, so the Court need not address it as an issue. Plaintiffs do not argue that any other regulations are relevant to their claim.

9

possible." Dkt. # 55, at 24.[7] As to American, plaintiffs assert that American "fail[ed] to provide medical personnel at the airport after having been informed of the in-flight emergency." Dkt. # 57, at 7. However, plaintiffs fail to support these arguments with any facts, nor do they explain why or how these actions or omissions were careless or reckless.

Plaintiffs cite no procedure or regulation that requires, or even suggests, that in an emergency situation like the one experienced on this flight, the pilot should communicate with the passengers prior to remedying the emergency. Instead, plaintiffs attempt to compare this situation to the one in Abdullah, in which there was a question about whether the way in which warnings about upcoming turbulence and/or the illumination of seatbelt signs "were conveyed to the passengers constituted careless or reckless operation." Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 372 (3d Cir. 1999). In this case, however, the emergency presented itself without warning when the indicator light illuminated and the cabin lost pressure. Unlike Abdullah, there is nothing in the record to suggest that the pilot or crew had any prior notice that this emergency situation would arise, so of course they could not issue a warning to passengers. Under the circumstances, it is obvious that the first thing to do was handle the emergency, which required a rapid descent to a safe altitude, and then once it is under control, inform the passengers as to the situation. Indeed, this is consistent with the established procedures that were followed by the pilot and crew. Dkt. # 40-4, at 2-3; Dkt. # 40-5,

---

[7] At one point plaintiffs also state that Mesa was negligent for a "lack of appropriate training, lack of appropriate procedures, or lack of enforcement of the polices that do exist," Dkt. # 55, at 22. However, they do not elaborate or explain those allegations at all. In addition, plaintiffs do not cite anything in the record, nor has the Court found anything, to support these statements concerning a lack of appropriate training, procedures, or lack of enforcement of existing procedures. Instead, the entirety of the record as presented supports the opposite finding: defendants had proper training and procedures in place, and the flight captain and crew executed those procedures in accordance with federal regulations.

at 7, 8, 20. Executing established and approved procedures to manage an emergency cannot be careless or reckless; therefore, Mesa did not breach its duty to plaintiffs by failing to communicate with the passengers until after the crew completed the emergency descent procedure.

Plaintiffs also argue that "the pilot did not descend to the highest safest altitude," as outlined in the emergency descent procedure, "rather he descended to the lowest altitude possible." Dkt. # 55, at 24. However, this supposed deviation from procedure is also not supported by the record. Instead, the emergency descent procedure instructs the crew to descend to 10,000 feet or the "lowest safe altitude, whichever is higher." Dkt. # 40-5, at 8. Plaintiffs seem to suggest that the aircraft could have descended to a higher safe altitude, but do not provide anything in the record to suggest what that was. Meanwhile, Captain Aquino stated in his affidavit that 10,000 was the safe altitude under the circumstances. Dkt. # 40-4, at 3. This is buttressed by the findings in the expert report of defendants' expert witness, which explains the physiological need for people to be in an air pressure environment that is equivalent to being at or below 10,000 feet of altitude. Defendants' expert states that "[b]elow 10,000 ft, the reduced levels of oxygen are considered to have little effect on aircrew and healthy passengers but above that, the effect becomes progressively more pronounced." Dkt. # 40-5, at 17. Therefore, "[i]n the case of an uncontrolled depressuri[z]ation," as was experienced here, the appropriate solution is "to descend immediately to an altitude at which [the crew] and the passengers can breathe without supplementary oxygen - usually given as below 10,000 [feet]." Id. at 18. Descending rapidly is critical because an aircraft's emergency oxygen supply is finite, and so the crew must quickly get the aircraft to an altitude at which the people on board can breathe without the oxygen masks before that oxygen supply extinguishes. Id. at 19. Given the effects of altitude on human performance and the circumstances of this emergency, there

is no reason to believe that the "highest safest altitude" was above 10,000 feet. Instead, the record supports that crew's execution of the emergency descent to 10,000 was proper and in accordance with the approved procedures.

In addition to standards set by federal regulations, plaintiffs also argue that the aircraft crew "breached their self-imposed duty as identified in Mesa Air Group, Inc. Code of Conduct and Ethics," which states that "[p]rotecting the health and safety of our employees and customers is a paramount goal. . . . Everything we do in performing our jobs must be consistent with our goal of creating . . . a safe and enjoyable experience for our passengers." Dkt. # 55, at 8 (quoting Dkt. # 55 at 40). However, the Court need not decide whether Mesa can be liable in negligence for a breach of its own conduct polices, as, once again, plaintiffs fail to present any evidence or cite to anything in the record that indicates that Mesa acted contrary to this policy. It does not appear that any of the actions taken by the flight crew were inconsistent with the goal of protecting the health and safety of the passengers. Instead, the record indicates the crew acted swiftly to address an emergency situation caused by an equipment malfunction, keeping the passengers and crew of the flight safe from catastrophe.

Finally, plaintiffs' accusations against American are also entirely without merit. American did not operate the flight, so it was not involved with the emergency situation at all. Instead, plaintiffs suggest American's negligence arises from its acts or omissions after the flight, specifically, that American "fail[ed] to provide medical personnel at the airport after having been informed of the in-flight emergency." Dkt. # 57, at 7. Plaintiffs cite no regulation or procedure that requires, or recommends, that American should have provided medical personnel at the gate even though no injuries were reported and plaintiffs did not request medical attention. Dkt. # 63-3, at 2;

Dkt. # 63-4, at 2. The Court finds that there is nothing careless or reckless about not proactively dispatching medical personnel to attend to passengers who: 1) did not request medical assistance, and 2) were on a flight that American did not operate.

Based on the record, the Court finds that the defendants acted reasonably and safely during and after the emergency. Everything in the record demonstrates that defendants' actions were wholly compliant with the relevant federal regulations and their own procedures. Plaintiffs have not presented any evidence to the contrary, nor have they provided even an iota of evidence that suggests defendants otherwise acted carelessly or recklessly at any point during or after the emergency. Thus, defendants satisfied the applicable standard of care, and have not breached any duty to plaintiffs.[8] Therefore, the Court finds that defendants were not negligent and are entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that defendant Mesa's motion for summary judgment (Dkt. # 40) and defendant American Airlines's motion for summary judgment (Dkt. # 42) are **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that defendants' omnibus motion in limine (Dkt. # 45), motion to exclude expert testimony by Dan Howard (Dkt. # 46), motion in limine to exclude testimony, evidence, or references concerning liability or fault from laypersons (Dkt. # 47), motion in limine regarding expert testimony not disclosed during discovery (Dkt. # 48), motion in limine regarding punitive damages and the financial condition of defendants (Dkt. # 49); as well as plaintiff

---

[8] As this summary judgment is granted at the breach element of negligence, the Court need not discuss whether defendants' acts or omissions caused plaintiffs' alleged injuries.

Chrystal Antao's motion in limine (Dkt. # 50), and plaintiff Deborah Brandshaw's motion in limine (Dkt. # 51) are hereby **moot**.

**DATED** this 2nd day of June, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE